No. 33,193

Thomas W. Reynolds, *Appellee,* v. Cyrus Guthrie, *Appellant.*

(65 P. 2d 272)

Opinion filed March 6, 1937.

*Tinkham Veale,* of Topeka, for the appellant.

*Henry Dangerfield* and *Frank E. Miller,* both of Topeka, for the appellee.

The opinion of the court was delivered by

Smith, J.: This was an action to recover damages alleged to have been sustained when defendant shot plaintiff through the foot with a .32-caliber revolver. Judgment was for plaintiff. Defendant appeals.

Defendant is a real-estate agent. He maintains an office in a corner room of his residence. During the summer of 1935 plaintiff was renting a house for which defendant was agent. Plaintiff became in arrears in his rent. Defendant served a three days' notice upon him to vacate. When this notice was served plaintiff called upon defendant and made arrangements to pay. Between the dates of August 24th and 31st plaintiff made three trips to the office of

defendant and made payments on his rent. The trouble out of which this action arose happened on September 14, 1935. On that date plaintiff called on defendant at his office and paid his rent up to that date. At that time some words passed between them about a pump that had been on the premises rented by plaintiff. The outcome of this was that defendant went into an adjoining room, obtained a revolver, came back into the office and shot plaintiff through the foot. This action followed. There was a verdict for plaintiff. Certain special questions were answered by the jury. Defendant filed a motion to set aside certain of the answers because there was no evidence to sustain them, and also filed a motion for a new trial. Both of these motions were denied. This appeal followed.

The special questions answered by the jury were as follows:

"1. Do you find from the evidence that the property at 309 Quincy street, Topeka, Kansas, where the plaintiff alleges in his petition the alleged assault occurred, was the home and the office of the defendant? A. Yes.

"2. After the plaintiff had paid some rent to the defendant, did the defendant on several occasions request the plaintiff to leave his premises, before defendant discharged his revolver? A. Yes.

"3. Did the plaintiff remain on the premises of the defendant, after the defendant had requested him to leave the premises? A. Yes.

"4. If you answer the preceding question in the affirmative, about how long did the plaintiff remain on the premises of the defendant after the defendant had requested him to leave the premises? A. Three minutes.

"5. At the time the defendant shot the plaintiff, was the plaintiff threatening to assault the defendant? A. No.

"6. Did the defendant believe, in good faith, at the time he shot the plaintiff, that the plaintiff was about to assault him? A. No.

"7. Did defendant have any malice toward plaintiff at the time he shot? A. No conclusive evidence of malice."

The answers which defendant argues should have been set aside because not sustained by the evidence are those to questions 4, 5 and 6.

Defendant first argues in this court that it was error for the trial court to deny this motion. This argument necessitates an examination of the evidence.

It will be remembered the office of defendant was in the corner room of his residence. The testimony of plaintiff was that he went to the office of defendant about 1 o'clock p. m. to pay him some rent money; that the desk was in the southeast corner of the room; that

there was a door leading from the office to the west which led to the kitchen, and another leading from the room.to the north which went to a bedroom; that while defendant was writing a receipt for the money paid him by plaintiff he said, "What became of that pump that I had that you took off the back porch?" that he told defendant it was still there, and that defendant asked him where the cylinder was and that he stated he did not recall that there was a cylinder, and did not remember what became of it; that after some controversy regarding a cylinder and a pump defendant went to the room on the west; that during the time defendant was absent from the room plaintiff remained, and when defendant returned to the office and sat down at his desk plaintiff went over and sat down by defendant. Plaintiff then testified as follows:

"Q. You sat about four feet away?  A. Yes, sir.

"Q. What did he say when you sat down and you took your seat?  A. I said, 'Mr. Guthrie, if you got time we will go over to the barn and really find out what is there. I can't recall that cylinder.' He said, 'I don't care a damn about that cylinder if it is no good,' and I said, 'Mr. Guthrie, I don't like your damned insults and insinuations,' and he got up and walked past me.

"Q. When you said that did he get up from his chair?  A. Yes, sir.

"Q. Where did he go?  A. Went in the bedroom.

"Q. In going from his chair to the bedroom, did he pass you?  A. Yes, sir.

"Q. How close?  A. Within a foot.

"Q. What did you do while he was in the bedroom?  A. Just sat there.

"Q. Sat there in the chair?  A. Yes, sir."

Plaintiff testified that defendant did not request him to leave as he was going to the bedroom and made no statement whatever.

Plaintiff then testified that he next saw defendant in the doorway of the bedroom with a gun in his hand; that he pointed it at the head of plaintiff and told him to get out; that plaintiff rose from the chair and said, "Guthrie, what are you saying? What are you going to do with that gun?"

Plaintiff then testified as follows:

"Q. Were you frightened?  A. Well, I didn't dare move. I couldn't get out of there without going towards him.

"Q. Tell the jury whether or not it was possible for you to get to the door and leave the room without stepping towards Mr. Guthrie.  A. I had to advance to get out of the room.

"Q. Were you afraid to advance?  A. Absolutely.

"Q. State what he said, if anything, after you arose from your chair and stood there.  A. As I said, 'What are you going to do with the gun?' was when he shot."

On cross-examination plaintiff testified substantially as he had on direct, except that he went a little more into detail as to the conversations. He testified that he told defendant that he did not like to have him insinuate that he had taken the cylinder and sold it, and that he did not like defendant's insults and insinuations about that cylinder; that defendant accused him of giving it away or selling it; that he thought all the time up to the time he was shot that defendant had insulted him. He testified that the first time defendant left the room he was gone fifteen minutes and plaintiff went to the front door and stood there; that when defendant came back into the room plaintiff asked him to go over to the barn and see what was over there; that defendant said he "didn't care a damn about this cylinder"; that he went from the front door and sat down by the desk of defendant; that he had his hand on his hip; that he stood that way to ease his position; that he did not go home when defendant left the room to eat his lunch because he thought that if he could get defendant to go over to his wife she would straighten it out; that he did not leave after defendant told him he did not give a damn about the pump because he wanted to reason it out with defendant; that defendant said he never insulted plaintiff; that plaintiff said, "What do you call it when you accuse me of taking something that didn't belong to me and disposing of it?"; that defendant did not tell him to leave the premises until he pulled the gun on plaintiff; that defendant was in the bedroom about two minutes; that he did not leave then to avoid trouble because he did not know there was any trouble to avoid; that he expected defendant saw him with his hand on his hip; that defendant first aimed the gun at plaintiff's face; that plaintiff did not tell him he would leave during this time; that defendant just shot that once; that plaintiff was five or six feet from defendant when he shot; that as he went out he passed within four feet of defendant, but that defendant did not shoot him any more.

There were only two eyewitnesses to the shooting. The story told by plaintiff was that he came to the office of defendant in a peaceable manner on business; that the altercation that resulted in the shooting was started when defendant made the inquiry about the pump. It is true that plaintiff remained in the office after the business of paying the rent had been finished, but what he said occurred was but little more than an ordinary discussion of a matter connected with plaintiff's occupancy of the premises for which

he was paying the rent. Certainly, according to this evidence, he was not making any assault on defendant when he was shot. He was sitting down when defendant entered the office with the gun. He had risen when defendant shot, but he was six or seven feet from defendant when defendant shot and he could not obey the command of defendant and leave the office from where he had been sitting when defendant pointed the gun at him without advancing toward defendant. The jury was the sole judge of the credibility of the witnesses. If the testimony of plaintiff was believed the jury was warranted in finding that plaintiff was not threatening to make an assault upon defendant at the time defendant shot him and that defendant did not believe in good faith, at the time he shot plaintiff, that plaintiff was about to make an assault upon him. As to the answer to question 4, that plaintiff remained on the premises three minutes after defendant had requested him to leave, defendant argues that the evidence was that plaintiff remained much longer than that. According to the story told by plaintiff, defendant did not make any such a request until he came out of the bedroom door with the gun in his hand. Only about three minutes elapsed from that time until plaintiff left. So far we have only set out the testimony of the plaintiff. Before discussing the next point argued by defendant we will set out the testimony of defendant.

He testified that plaintiff said, "Yes, somebody told you I was going to beat the rent," and that plaintiff was cross. He testified as to some profanity used by plaintiff and that plaintiff had his hand behind his back, and that he talked in a high-pitched tone of voice; that when plaintiff said he had not come there to be insulted, he got up and left the office and that was the first time defendant told plaintiff to leave; that as defendant passed plaintiff, when plaintiff said he did not have to steal to live, defendant said, "Now you have said enough. I want you to leave." Defendant then testified as follows:

"And I passed him into the bedroom and got my little popgun.

"Q. This little gun here? A. Yes, sir; this is the gun and I expect I stood there by the dresser a minute or two, waiting for him to go out, but he didn't go, so I came to the door and told him to get out or I was going to shoot him, and he still continued to stand there and stared at me.

"Q. Where was his hand? A. He was sideways to me and I didn't see his right hand at all, at any time, and I threatened him two or three times, if he didn't get out I was going to shoot him, and he was standing there, staring at me, and instead of him indicating he was going to get out or make a movement

like he was going to, he made a move like he was going to rush me and then is when I fired into the floor."

Defendant testified that he thought plaintiff was rushing him to whip him because he had served the notice to quit. It will be remembered that this notice had been served some weeks before the shooting. Defendant testified that after he fired the shot plaintiff stopped, and that he had taken about two steps and that plaintiff took these steps in a rushing way, and looked very cross and determined; that he had no reason for shooting plaintiff except to protect himself; that the conversation had between plaintiff and defendant when plaintiff first came to the office had frightened him; that he demanded a dozen times that plaintiff get out. On cross-examination defendant testified in part as follows:

"Q. How much time elapsed from the time you came out with the gun until you pulled the trigger? A. I expect a minute.

"Q. Now, was there any way on earth he could have left from where you say he was standing by this desk here, that he could have gone out the front door of your office without approaching towards you? A. No, there wasn't.

"Q. Wasn't any way on earth? What did he say after you shot this gun? A. I couldn't understand what he said but I demanded he get on or I would shoot him again or shoot him, and then he went to the door and stopped at the door and turned halfway around again.

"Q. What did he say when you first appeared at the doorway with the gun? A. Not a word.

"Q. Didn't he ask you what you were going to do with that gun? A. No, he just stood there in a defiant attitude and argued."

Defendant filed a motion for a new trial on all the statutory grounds. He argues here, however, that the trial court erred in denying the motion because the verdict was contrary to the evidence, and because the court refused to give an instruction requested by defendant.

We shall consider first the argument that the verdict was contrary to the evidence. The argument on this point is that it was the duty of plaintiff to leave the premises of defendant when he was requested to do so; that he became a trespasser when he refused to leave. The trouble with that argument is that according to the story told by plaintiff, which the jury had a right to believe, the defendant did not request plaintiff to leave until he came out of the bedroom with the gun in his hand, and according to the testimony of defendant himself plaintiff could not leave the place where he was standing without advancing toward defendant. Defendant cites and relies on authorities which deal with the liability of one who ejects a trespasser

when the trespasser uses force or violence to resist being ejected. These authorities are not in point here because the jury found on disputed evidence by its general verdict that plaintiff was not using any violence. Indeed, a critical examination of the testimony of defendant himself does not disclose any violence on the part of plaintiff until the gun was pointed at him, and he denies this violence. It is true that defendant testified that he thought he was about to be assaulted, but the jury had a right to consider this testimony in the light of all the surrounding facts and circumstances. No doubt it considered this testimony and then considered the testimony of plaintiff that he was sitting down when the gun was first pointed at him and the testimony of both plaintiff and defendant that plaintiff could not obey the command of defendant to leave the room without advancing toward defendant, and the testimony of defendant that plaintiff had taken only two steps forward when he shot, and decided not to believe defendant when he said he was afraid plaintiff was going to assault him. At any rate, it is not the province of this court to ascertain why the jury found the way it did as long as there was substantial competent evidence to sustain the finding made.

In this connection defendant points out that the jury found in effect that he had no malice toward plaintiff. Defendant argues that the shooting had to be done with malice or in self-defense and that since the jury found that there was no malice then it must follow that the shooting was done in self-defense and was excusable. This does not necessarily follow. It is true that the defendant in this case denied that he intended to shoot plaintiff. He testified further, however, that he discharged the revolver in the direction of plaintiff to scare him. We know now that he actually hit plaintiff in the foot with a bullet discharged from the revolver. It is true that this action was to recover for assault and battery and not for negligence, and there had to be intent but not necessarily intent to do the particular act that caused the damage. An instruction to the jury that the jury might infer malice from the use of a deadly weapon would have been proper. (See *Eckerd v. Weve,* 85 Kan. 752, 118 Pac. 870.) It is true that no such instruction was requested. Neither was there any instruction given clearly stating that malice in a case such as this simply means the intentional doing of a wrongful act. Such an instruction would have been proper. (See *Hackenberger v. Travelers Mutual Cas. Co.,* 144 Kan. 607, 62 P. 2d 545.) It should be noted in this connection that the answer of the jury to the question whether

322

defendant.had any malice toward plaintiff at the time he shot was "no conclusive evidence of malice." We hold that such a finding does not.justify a conclusion that defendant was not liable under the admitted.facts in this action. This case is an illustration of what happens when there is a gun handy. The safest place for this revolver would have been locked up in a dresser drawer with the key thrown away. Plaintiff is fortunate that he is not dead and defendant is fortunate that he is not facing a charge of homicide. The use of firearms under such circumstances went out of style about the time Wild Bill Hickok faded from the picture.

On this point defendant argues that the fact plaintiff stayed in the office of defendant and used abusive language was the cause of the injury of plaintiff and that plaintiff's negligence or wrongful act had a material effect in producing the injury or contributing to it. The doctrine of contributory negligence does not apply to a case of this sort. The basis of liability here is not negligence but the intentional, wrongful act of defendant. Defendant was guilty of an assault when he pointed the gun at plaintiff. The firing of the bullet was a further step that caused the actual damage. (See *Eckerd v. Weve*, supra; also, *Steinmetz v. Kelly*, 72 Ind. 442, and *Ruter v. Foy*, 46 Iowa 132.)

The second ground upon which defendant argues that a new trial should have been granted is that the trial court did not give an instruction requested by defendant. It is not necessary to set out the requested instruction here. Suffice it to say it starts out as follows:

"One who has wrongfully assaulted or threatened to do another bodily harm, cannot be heard to complain in a civil action by himself against the party he has threatened to assault because the party he threatened to assault, in attempting to defend himself, has used more force than was actually necessary in repelling the assault."

Defendant cannot complain of this because, as we have already said, the evidence warranted the jury in finding that plaintiff was not making an assault upon defendant when he was shot.

The jury was properly instructed as to the law of self-defense, that a person unlawfully assaulted had a right to stand his ground, and resist with force, and that defendant had a right to exercise such force as may have reasonably appeared to him in good faith at the time to be necessary to protect himself from bodily harm, even though he was not actually in danger. We have concluded that the defendant had no cause to complain of the instructions of the court.

The judgment of the trial court is therefore affirmed.